# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2012 Session

## STATE OF TENNESSEE v. PAUL ROBERT CARRIER, JR.

**Appeal from the Circuit Court for Montgomery County**
**No. 41001064   Clayburn L. Peoples, Judge**

---

**No.  M2011-01950-CCA-R3-CD - Filed June 18, 2013**

---

Appellant, Paul Robert Carrier, Jr.,  who was a police officer, was indicted by the Gibson County Grand Jury for one count of reckless homicide for a shooting death that occurred while he was on duty.  Following a change of venue, he was tried by a jury in Montgomery County.  The jury convicted him as charged.  The trial court sentenced Appellant to two years incarceration and denied his request for judicial diversion.  On appeal, Appellant argues that the trial court erred in allowing certain testimony at trial and in denying his request for judicial diversion.  After a thorough review of the record, we conclude that the trial court did not err and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Randy C. Camp and David W. Camp, Jackson, Tennessee, for the appellant, Paul Carrier.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; and Garry Brown, District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. FACTS

On February 22, 2009, Appellant, who was a Humboldt Police Officer, was patrolling an area known as "the crossing."  The crossing is the location of several bars.  His supervisor, Sergeant Jimmy Arnold, was also patrolling the area.  When the bars closed at 3:00 a.m., the officers saw a white Crown Victoria squeal its tires as it left a parking lot.  Sergeant Arnold

told Appellant that they needed to check the Crown Victoria out. The officers got into their cars and followed the Crown Victoria.

Sergeant Arnold was behind Appellant while they were following the Crown Victoria. The Crown Victoria pulled into a driveway about a block away. Sergeant Arnold stood with the driver of the car, Derrick Motley. Sergeant Arnold saw Appellant get out of his car and run behind a house. Sergeant Arnold heard Appellant yelling at someone to stop. He saw an African-American male running and quickly lost sight of him. Witnesses testified at trial that Appellant was chasing the African-American male and Appellant had a gun in his hand. Shortly thereafter, Sergeant Arnold heard a gunshot. Sergeant Arnold found Appellant in the backyard of a home. Appellant was in shock and said that he had shot the victim. Sergeant Arnold secured Appellant's weapon, a Glock .40 caliber pistol. When Appellant returned to the police station, he stated that he had tripped, his gun had gone off, and he had shot an unarmed person.

The Gibson County Grand Jury indicted Appellant for one count of reckless homicide. Appellant successfully moved for a change of venue, and he was tried in Montgomery County. Appellant also filed a motion in limine requesting that the State be prevented from presenting proof of Appellant's firearms training and proper procedures for using a firearm. The trial court denied this motion and the State was allowed to present such evidence.

Tennessee Bureau of Investigation ("TBI") Agent Kevin Warner testified at Appellant's trial. His position is special agent forensic scientist and his specialty is firearms identification. He stated that the shell casing found at the scene and the bullet that was removed from the victim's body were consistent with being fired from Appellant's gun. Agent Warner testified that he was able to determine that the fatal bullet wound was not a contact wound. He estimated that the gun was fired within 36 inches of the victim. Agent Warner also stated that Appellant's gun did not contain any sort of safety device. The trigger had to be pulled in order to fire the weapon.

At the autopsy, Dr. Marco Ross determined that the bullet entered the middle of the victim's back and continued through the victim's body with a slight downward trajectory. Dr. Ross opined that the trajectory of the bullet was consistent with Appellant's contention that he tripped and was down on his hands and knees when the gun fired.

Agent Cathy Ferguson is a special agent with the TBI. She investigated the case at hand. As part of her investigation, she interviewed Appellant. She stated that Appellant was visibly upset when she interviewed him. The interview occurred several hours after the shooting. Initially, Appellant told her that he chased the victim after a traffic stop. A foot chase ensued, and he fired a warning shot during the foot chase because the victim threw a

rock at him. The victim fell while Appellant was chasing him and as Appellant approached him, the victim grabbed Appellant's sleeve. When he grabbed the sleeve, Appellant pulled away and the gun discharged as a result. A few days later, Appellant gave a different explanation to Agent Ferguson. He said that the victim did not grab his coat sleeve. He told her instead that the victim grabbed his hand, which caused Appellant to slip on some gravel. As he slipped, his gun discharged. He told Agent Ferguson that his finger was not on the trigger while he was pursuing the victim, but it did slip onto the trigger as he fell.

Agent Ferguson stated that she is a Peace Officers Standards and Training ("POST") certified firearms instructor. POST is a state agency that oversees firearm training for all law enforcement officers in Tennessee. Agent Ferguson is also a firearms instructor for the TBI She is certified to teach any law enforcement officer firearm training. She stated that she had testified on previous occasions as an expert in the field of firearms and firearm instruction. In addition, she was qualified as a certified armorer in regards to Glock firearms. A certified armorer with regard to a Glock weapon is qualified to repair and analyze a Glock weapon. After a bench conference and a subsequent jury-out hearing, the trial court instructed the jury that they should consider Agent Ferguson an expert witness in the field of firearms.

Agent Ferguson testified that part of firearms instruction included instruction under when and under what circumstances an officer may use deadly force. She stated that the instruction is based on the language found in Tennessee Code Annotated section 40-7-108 regarding that topic. She said that "in general it means that you may use deadly force in protection of yourself or in the protection of another person . . . ." Agent Ferguson testified that in a ten-week police academy training course one week would be dedicated to firearms including the appropriate use of deadly force. In addition, officers are required to complete an annual in-service training which also includes instruction on the use of deadly force.

With regard to Appellant's specific training, Agent Ferguson testified that Appellant attended police academy training at Cleveland State in 2007. She found the training materials from that time frame. She stated that the training materials included a Powerpoint presentation that she presented at trial. The Powerpoint presentation included the following language:

### Safety Considerations

- Developing a "Safety Reflex"
  - Safety rules should become so ingrained that you can't make yourself violate them
- Set of Safety Rules

- CORE Rules that are always applicable
- Other Range Safety Rules
- You are responsible for your safety and that of everyone around you!

## CORE Safety Rule #1

1. It is my responsibility to keep myself, and everyone else, safe. Safety is a personal commitment made by everyone at all times

## CORE Safety Rule #2

- Muzzle Discipline
  - I will always keep my muzzle pointed in the safest possible direction and never intentionally cross the muzzle across anything I am not prepared to shoot
  - The Safest Possible Direction is one where NO injury and only minor/no property damage could occur [if] an unintentional round is fired.

## CORE #2 Continued

- Remember the "Laser Rule" – Consider your handgun as having a laser beam coming out of the muzzle and whatever it touches will be cut through. Wherever the muzzle points is where the laser beam goes.

## CORE #3

- Trigger Finger
  - I will keep my trigger finger straight along the frame of the gun unless the muzzle is pointed at something I am prepared to shoot.

## CORE #3

- The Trigger finger is only placed inside the trigger guard and on the trigger when coming onto target just before firing.
- When you stop firing, take the trigger finger out of the trigger guard and lay it straight along the frame.
- Holding finger just outside the trigger guard could cause a convulsive reaction where the finger goes inside the frame

## At Work

Never remove a firearm from its holster during duty hours unless:
*       Ordered to produce the firearm for inspection by a qualified firearms instruction
*               Involved in, or about to become involved in, a confrontation reasonably believed to require the use of deadly force

## At Work Continued

The two principle safety rules are applicable on the street
-Finger along frame
-Muzzle in the safest possible direction
-Be sure to keep weapon secured in the holster WHEN NOT NEEDED!

-Responsible for who?

## Point of Aim

•       always center of mass of the target offered or selected.
•       Why?
        -       Primary reason - biggest target and most room for error.
        -       Secondary reason - greatest concentration of vital organs

Agent Ferguson testified that this slide presentation was consistent with what is taught in POST training given to officers in Tennessee. She stated that warning shots are prohibited in Tennessee. At trial, Agent Ferguson demonstrated for the jury the proper technique of handling a gun by placing the trigger finger along the pistol's frame, unless the officer intended to shoot the gun. The weapon used by Appellant, the Glock, had no safety feature other than a trigger safety. The trigger safety allows the trigger to only be pulled straight back with a five and a half pound pull. The trigger on the Glock cannot be pulled at an angle. Agent Ferguson stated that Appellant's weapon could hold a maximum of fifteen rounds. When the weapon was received immediately after the shooting, it contained thirteen rounds.

Agent Ferguson stated that her conclusion was that the shooting was the result of an accidental discharge. She stated the following without objection:

I believe, based on the facts, that [Appellant] had fired a warning shot; I
believe his finger was still on the trigger when he was running; I believe when
he encountered [the victim] in the alleyway between the two houses, that when
he slipped his finger was still on the trigger and it was a sympathetic reflex to
– to flex your fingers to fall to catch yourself, and I believe that's why the gun
accidentally went off was because he had his finger on the trigger.

Bill Baker is the assistant police chief with the Humboldt Police Department.
Assistant Chief Baker testified at trial that Appellant was issued a Glock when he was hired.
When he was hired, the Humboldt Police Department also supplied the regulations on the use
of deadly force. Appellant was required to acknowledge reading the regulations by signing
at the conclusion of the packet. According to Assistant Chief Baker, the Humboldt Police
Department's guidelines state that "Officers are justified in drawing a weapon when they
perceive a life-threatening situation or a threat of serious injury." Otherwise, they should
"not unnecessarily draw or display any firearms or other weapons." In addition, the
guidelines specifically prohibit the firing of warning shots. "No warning shots shall be fired.
Deadly force may not be used if it creates more risk or danger to innocent bystanders and/or
property than it does the suspect." The department guidelines also state the following:

[T]he value of human life far outweighs the gravity of an offense that does not
inflict or threaten to inflict serious bodily harm. Consequently deadly force
shall not be used to affect the arrest of a person who is to be charged with any
misdemeanor offense or any noncapital felony offense.

Appellant also testified at trial. He stated that he and Sergeant Arnold were patrolling
"the crossing" at 3:00 a.m. when they saw a white Crown Victoria screeching as it left the
parking lot. Both officers jumped in their patrol cars and followed the Crown Victoria. The
suspect vehicle pulled into a driveway and both occupants got out. The passenger ran around
the house, and Appellant followed him. Appellant stated that he went to see where the
passenger was going because he did not want the passenger "to ambush" them. Appellant
said he drew his gun. Appellant said that while he was chasing the victim, the victim threw
something at him. According to Appellant, he was fearful of bodily injury and fired a
warning shot and ordered the victim to stop. Appellant specifically stated that after firing the
warning shot, he placed his trigger finger along the side of the gun as he was taught to do to
avoid accidental discharge.

At this point of the chase, Appellant considered the victim a perpetrator of assault and
evading arrest. Appellant stated that the victim tripped and fell but got up and continued to

run. The victim slipped again, and Appellant caught up to him. He approached the victim when the victim raised his right arm. Appellant believed the victim was reaching for his gun so he jerked away from the victim and fell. As Appellant fell, he stated that the gun accidentally fired. Appellant maintained that his finger was not on the trigger but alongside the frame as he fell. Nonetheless, the victim was shot in the back and died from the wound.

At the conclusion of a trial, the jury found Appellant guilty of one count of reckless homicide. The trial court sentenced Appellant to two years incarceration. He was denied judicial diversion and alternative sentencing.

## ANALYSIS

### Motion in Limine

Appellant's first issue is the that the trial court erred in denying his motion in limine to prevent the presentation of evidence "as to the training of [Appellant] as a police officer or what the actions of a police officer should be as part of [the State's] case in chief." Appellant briefed the issue as follows:

> The trial court erred when it denied the Defendant's motion in limine and allowed the State of Tennessee to introduce evidence of policy and procedure violations by and through an expert witness that testified to said violations when the expert's opinion had not been disclosed after having been requested in discovery from the Defendant and said opinions were speculative.

The State argues that the trial court properly denied the motion in limine; that the record is not clear that there was a discovery violation and furthermore the discovery violation issue was not raised in the motion for new trial; and the witness's testimony on redirect was proper because Appellant opened the door and Appellant failed to object at trial.

Appellant argues that the trial court erred because "there [was] no basis to support introduction of the evidence as to 'police officer' standard. By allowing introduction of evidence regarding the actions of a 'police officer', the trial court erred by holding [Appellant] to a higher standard than that of an 'ordinary person' required by the statute."

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*,

930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Appellant was charged with reckless homicide. Under Tennessee Code Annotated section 39-13-215(a) reckless homicide is defined as "a reckless killing of another." Reckless is defined at Tennessee Code Annotated section 39-11-106(a)(31) as follows:

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint . . . .

In *State v. Ballard Eugene Anderson*, No. 03C01-9902-CR-00084, 2000 WL 122218 (Tenn. Crim. App., at Knoxville, Jan. 26, 2000), this Court analyzed the meaning of the term "reckless" in regard to reckless homicide. This Court stated the following:

> The risk of which the accused is aware must be substantial in order for the recklessness judgment to be made. The risk must also be unjustifiable. The awareness of the risk is measured *from the actor's point of view*. The question remains as to what standard is used in determining how substantial and how unjustifiable the risk must be in order to warrant a finding of culpability. These are questions to which the jury must evaluate the actor's conduct and determine whether it should be condemned. Thus, the jury must answer two questions: (1) to what extent was the actor aware of the risk, of factors relating to its substantiality, and of factors relating to its unjustifiableness; and (2) whether the actor's conscious disregard of the risk justifies condemnation. *See* Comment, MODEL PENAL CODE §§ 2.02 and 210.2(4) (1985). *See e.g., State v. Dean Benjamin Clark, II*, No.

02C01-9705-CC-00186[, 1998 WL 227774] (Tenn. Crim. App. at Jackson, May 8, 1998).

*Ballard Eugene Anderson*, 2000 WL 122218, at *3 (emphasis added).

As stated above, in its determination as to whether Appellant's actions were reckless, the jury was to look at his actions from his point of view. Because this Court has interpreted the finding of reckless based upon the actor's point of view, we conclude that Appellant's training as a police officer with regard to the handling of firearms is relevant to show Appellant's awareness of the risks of handling a weapon during the chase of a suspect. Appellant's training and instruction to not unholster his weapon unless the officer's life or another life was being threatened, to not fire warning shots, and to keep the trigger finger along the frame instead of on the trigger counsel how a person in Appellant's position, i.e., a trained police officer should deal with the risks involved with firearms during encounters with criminal suspects. Therefore, we agree with the trial court's determination that the information was relevant at trial and denial of the motion in limine.

## Discovery Violation

Appellant also argues that he filed a discovery request prior to trial for any and all witnesses and information to be used by such witnesses to offer opinion testimony. He argues that Agent Ferguson and her testimony constituted such a witness and that Appellant was not given the information regarding Agent Ferguson as requested. The State argues that Appellant did not included this argument in his motion for new trial, so the issue should be waived.

The State is correct in its assertion that Appellant did not base his motion for new trial on the failure of the State to comply with a discovery request. Appellant's issue in the motion for new trial with regard to Agent Ferguson's testimony is as follows:

3.  That in a pretrial Motion in Limine as well as during the trial Movant objected to introduction of training policies and procedures as it relates to his profession as a police officer. That the Movant submits introduction of said evidence was confusing and misleading to the jury and placed the Movant to a higher standard of responsibility than other persons charged with similar offenses which clearly violates his rights to trial.

-9-

4.   Moreover, introduction of said evidence was not relevant to the events and circumstances as they arose during the early morning hours of February 22, 2009.

As noted by the State, Appellant did not raise any issue with regard to the exclusion of Mr. Taylor's statement in a written motion for new trial, as required by Tennessee Rule of Appellate Procedure 3(e). That rule provides, in pertinent part:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3.

Additionally, "[a] motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered. The court shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial." Tenn. R. Crim. P. 33(b) (emphasis added). Further, a trial court loses jurisdiction with the filing of a notice of appeal. *See State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996). In the case herein, Appellant raised the issue orally at the hearing on the motion for new trial but failed to reduce the issue to writing or submit an amended motion for new trial within thirty days.

Moreover, a party may not take one position regarding a ground in the trial court and change its strategy or theory midstream and advocate a different ground or reason in this Court. *See State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988); *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988).

Both before trial and during trial, Appellant argued that Agent Ferguson's testimony should be excluded because the police officer training requirements were not relevant to the issue at trial. During trial, Appellant also lodged an objection to Agent Ferguson's testimony based on the failure to receive her materials. However, after a jury-out hearing, Appellant withdrew his objection. He did not include this issue in his motion for new trial. Because he withdrew his objection, Appellant did not allow the trial court to rule on the objection.

-10-

This Court has no obligation to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Under these circumstances the issue of an alleged discovery violation is waived.

Agent Ferguson's Opinion

Appellant argues that Agent Ferguson should not have testified as to her opinion that Appellant had his finger on the trigger because there was no evidence in the record to support her opinion.

Appellant has cited no authority, such as Tennessee Rules of Evidence 702 or 703 or any caselaw, to support this argument. As stated above, Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

Furthermore, Appellant did not object at trial to Agent Ferguson's opinion testimony. Appellant's failure to object to the statements at trial constitutes waiver of the issue on appeal. *See* Tenn. R. App. P. 3(e) and Tenn. R. App. P. 36(a) (stating "nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). This issue is waived.

**Judicial Diversion**

The Criminal Sentencing Reform Act of 1989 states that, after accepting a guilty plea, a trial court may do the following:

> [D]efer further proceedings against a qualified defendant and place such defendant on probation upon such reasonable conditions as it may require without entering a judgment of guilty and with the consent of the qualified defendant. Such deferral shall be for a period of time not less than the period of the maximum sentence for the misdemeanor with which the person is

-11-

charged, or not more than the period of the maximum sentence of the felony with which the person is charged.

T.C.A. § 40-35-313(a)(1)(A). Judicial diversion is substantially similar to pretrial diversion; however, the decision to grant diversion rests with the trial court, not the prosecutor. *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). The decision of whether to place a criminal defendant on judicial diversion is within the sound discretion of the trial court and that decision will not be reversed on appeal if there is any substantial record evidence to support it. *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

Before determining whether to grant or deny judicial diversion, a trial court must consider the following factors: "(a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the status of the accused's physical and mental health, and (f) the deterrence value to the accused as well as others." *Id.* at 168. Additionally, the trial court should consider the accused's attitude, behavior since arrest, emotional stability, current drug use, past employment, home environment, marital stability, family responsibility, general reputation, and the likelihood that judicial diversion will serve the ends of justice and best interests of both the public and the accused. *See State v. Cutshaw*, 967 S.W.2d 332, 343-44 (Tenn. Crim. App. 1997). In addition, this Court has stated the following:

> Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination. The court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citation omitted).

We review a trial court's decision on whether or not to grant judicial diversion under an abuse of discretion standard. *See Cutshaw*, 967 S.W.2d at 344. Where the trial court follows the required procedure for determining whether or not to grant judicial diversion, we must affirm the trial court's ruling if any substantial evidence exists to support it. *See id.*

-12-

The trial court discussed Appellant's amenability, his remorse, the circumstances of the offense the lack of a criminal record, the fact that he had spent most of his life in public service, and that his physical and mental health was exemplary. The trial court, however, based its decision on the deterrence effect of Appellant's sentence.

The trial court stated the following:

> If all I had to consider were those aspects of the Defendant's life that have occurred prior to this offense and since this offense, then obviously he would be an ideal candidate for diversion, but there are other factors that I must consider. One of them is the deterrence value to the accused as well as others. The emphasis of the discussion has been upon law-enforcement officers using weapons in the line of duty or outside the line of duty.
>
> The fact is we now live in a society in this state in which a great, great number of people carry firearms legally for all sorts of purposes. . . . [W]hen you get into deterrence there are some kinds of people who are deterred much more successfully than other people. Generally speaking people who have jobs, people who are forward looking, people who care enough to obtain a license before they carry a firearm are the very kinds of people who could be deterred and, perhaps, would be deterred by however this case is treated. So I think the deterrent value to people in like circumstances being people who carry guns will, like circumstances being people who carry guns legally. I think that -- I think that is considerable.
>
> I also think, with all due respect, the Defense argument that, you know, just because he had the audacity to shoot a gun in the air, this is a -- this wasn't -- this wasn't an unfortunate accident; according to the jury and according to the way I interpreted the evidence this was a crime. We can't -- we can't evaluate this case based upon the idea that this was -- it was unfortunate, it was accidental according to the definition of -- of the offense with which he was convicted but that doesn't -- that doesn't change the fact that he committed a crime.
>
> And then we have to ask whether diversion serves the interest of the public as well as the accused. We didn't hear any proof and I don't think that there could have been any proof about what the public thinks about crimes committed by people in -- I certainly don't want to use the term high profile,

-13-

but publicly visible positions, people who are charged with enforcing the law, the public is certainly interested in what happens as they out to be. I do not think that diversion in this case would serve the interest of the public. I do think that given the extreme cost in this case that diversion would depreciate the seriousness of this crime. So I don't think diversion is appropriate, that does not however answer the question of what sentence should be imposed.

As stated above, if the trial court follows the procedure we must affirm the trial court's ruling if there is evidence to support it. *Cutshaw*, 967 S.W.2d at 344. We conclude that the trial court's reliance upon deterrence in this case is well-founded and, therefore, the trial court did not abuse its discretion. We affirm the denial of Appellant's request for judicial diversion.

## <u>CONCLUSION</u>

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE

-14-